PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. 5:11CR00584 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| JEEVA RANGARAJU | ) | |
| | ) | **MEMORANDUM OF OPINION &** |
| Defendant. | ) | **ORDER** [Resolving ECF No. 226] |

The Court must decide whether the Double Jeopardy Clause of the United States Constitution prohibits the Government from prosecuting a criminal defendant on counts of wire fraud and conspiracy to commit wire fraud. The issue is submitted to the Court upon Defendant Jeeva Rangaraju's motion to dismiss the Superseding Indictment. ECF No. 226.[1] The Court has reviewed the motion, the Government's opposition, ECF No. 228, Defendant's reply, ECF No. 229, the trial record and the controlling law. The Court also permitted additional argument at the final pretrial hearing. For the reasons provided below, the Court grants Defendant's motion and dismisses the Superseding Indictment in its entirety.

## I. Factual Background

### A. First Indictment

On December 14, 2011, a federal grand jury returned an Indictment charging Defendant and his co-defendants, Craig Robinson and Mahesh Saraswathy, with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and twenty-two counts of wire fraud in violation of 18

---

[1] When the Court cites to the electronic docket and provides a pinpoint citation, the pinpoint citation refers to the page number of the electronic document.

(5:11CR00584)

U.S.C. §§ 1343 and 2.  *See* ECF No. 1.  The Indictment alleged that the three defendants were officers of Allied Solutions Group, Inc., an information technology consulting business.  According to the Indictment, Allied entered into a "factoring agreement" with Aquent Financial Services, LLC, whereby Allied sold its accounts receivable to Aquent for a percentage of their value, generating an immediate cash flow for Allied.  Count 1 of the Indictment alleged that the defendants conspired to obtain excessive payments from Aquent by creating false invoices and submitting those invoices to Aquent for advance payment pursuant to the factoring agreement.  The Indictment alleged that, as part of the scheme, the defendants caused Allied to send Aquent fictitious bank records with inflated balances in order to create the appearance that Allied had genuine accounts receivable, to send Aquent fraudulent financial statements that falsely overstated the revenues of Allied, and to induce Aquent to continue purchasing Allied invoices.  Counts 2 through 23 each charged the three defendants with the substantive offense of wire fraud.  Each substantive count alleged that the defendants devised a scheme to defraud Aquent by false pretenses.  Counts 2 through 12 alleged eleven specific wire transmissions to Aquent containing false invoices.  Counts 13 through 23 alleged that the defendants "caused" Aquent to transmit eleven specific electronic transmissions of money in payment for the false invoices described in Counts 2 through 12.

Prior to trial, Robinson and Saraswathy pleaded guilty pursuant to separate plea agreements. They each pleaded guilty to the conspiracy count, Count 1, and several of the substantive wire fraud counts–but they specifically admitted to the conduct contained in all of the substantive wire fraud counts.  *See* ECF Nos. 93 at 17; 95 at 17.  Defendant pleaded not guilty.

Following an eleven-day trial, which included approximately two days of deliberation, the

(5:11CR00584)

jury returned a general verdict of acquittal on Counts 2 through 23.  ECF No. 213 at 26-37.  The jury

failed to return a unanimous verdict with respect to Count 1.  ECF No. 213 at 26.  Defendant moved

for a mistrial as to the hung count.  ECF No. 213 at 42.  After noting the length in which the jury

deliberated, the complexity of the trial, "several indications that the jurors were at an impasse and

could go no further," and the issuance of the *Allen* charge,[2] the Court declared that "manifest

necessity" dictated the declaration of a mistrial as to Count 1.  ECF No. 213 at 43.

**B. Superseding Indictment**

On March 12, 2013, a federal grand jury returned a Superseding Indictment against

Defendant only.  *See* ECF No. 194.  Count 1 charges Defendant with conspiracy to commit wire

fraud and is virtually identical to the conspiracy count in the original Indictment.  Counts 2 through

7 charge Defendant with six new (previously uncharged) substantive counts of wire fraud.  The

substantive wire fraud counts in the original Indictment described the transmission of false invoices

and the corresponding transmission of funds in payment for those invoices.  While the substantive

counts in the Superseding Indictment allege different transmissions (not invoice or money

transmissions) the scheme to defraud is the same as the scheme alleged in the original Indictment.

In particular, Count 2 of the Superseding Indictment alleges that Defendant transmitted, as

part of the scheme to defraud Aquent, an email pressuring Aquent for continued funding and

promising to provide financial information that Aquent had been requesting.  Count 3 alleges that

---

[2] The Court issued two *Allen* charges.  ECF No. 213 at 7.  An *Allen* charge refers to a supplemental instruction approved by the United States Supreme Court in *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), urging a deadlocked jury to continue deliberating.  *See Spears v. Greiner*, 459 F.3d 200, 204 (2d Cir. 2006), *cert. denied*, 549 U.S. 1124, 127 S. Ct. 951, 166 L. Ed. 2d 725 (2007).

(5:11CR00584)

Defendant created fraudulent Allied financial statements and emailed these documents in order to conceal and continue the scheme. Count 4 alleges that Defendant created fraudulent financial statements and transmitted, caused to be transmitted, or aided and abetted the transmission of a fax containing the financial statements to Aquent. Count 5 alleges that Defendant emailed Aquent and made false representations about Allied's bank accounts and ability to make payments. Count 6 alleges that Defendant emailed a fictitious letter purportedly drafted by Barclays Bank to a purported Allied customer, Hamilton Valves, regarding a stop payment order. Count 7 alleges that Defendant emailed Aquent and made false representations regarding Allied's and its purported customers' bank accounts and their ability to make payments to Aquent.

Significantly, evidence of the transmissions described in the new substantive wire fraud counts were presented by the Government during Defendant's trial as proof of his participation in the scheme to defraud Aquent. *See* Government Exhibits 183 (corresponding with Count 2); 190 (Count 3); 99 and 100 (Count 4); 193 (Count 5); 197 (Count 6); and 199 (Count 7).

**C. Motion to Dismiss**

Defendant now moves to dismiss the Superseding Indictment on the ground that the Government's prosecution is barred by the Double Jeopardy Clause of the United States Constitution. ECF No. 226. Specifically, Defendant asserts that the principle of *collateral estoppel*, or issue preclusion, bars prosecution in the present case because a fact necessary to the Government's case, namely, that Defendant was a participant in the scheme to defraud Aquent, was necessarily decided in his favor by the jury verdicts of acquittal. The Government opposes the motion and argues that (1) it is permitted under the law to reprosecute a criminal defendant on a

4

(5:11CR00584)

mistried count; (2) it may try Defendant on the new substantive wire fraud counts because "each use

of the wires constitutes a separate crime under" the wire fraud statute; and (3) Defendant fails to

show that the jury found that he was not involved in the scheme to defraud.  ECF No. 228.

## II.  <u>Governing Legal Principles</u>

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution

provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or

limb . . . ."  U.S. CONST. amend. V.  The Clause protects "two vitally important" interests.  *Yeager

v. United States*, 557 U.S. 110, 117, 129 S. Ct. 2360, 174 L. Ed. 2d 78 (2009).  First, it is well-

recognized that "the State with all its resources and power should not be allowed to make repeated

attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment,

expense and ordeal and compelling him to live in an continuing state of anxiety and insecurity, as

well as enhancing the possibility that even though innocent he may be found guilty."  *Id.* at 117-118

(*quoting Green v. United States*, 355 U.S. 184, 187-188, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957)).

Second, our system also possesses an interest in preserving the finality of judgments.  *Id.* at 118.

The first interest is implicated whenever the State seeks a second trial after its first attempt

results in a mistrial.  *Yeager*, 557 U.S. at 118.  In such an event, the Clause does not prevent the

Government from seeking to reprosecute because the "'interest in giving the prosecution one

complete opportunity to convict those who have violated its laws' justifies treating the jury's

inability to reach a verdict as a nonevent that does not bar retrial."  *Id.* (*quoting Arizona v.

Washington*, 434 U.S. 497, 509, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978).  When, however, a factual

issue was necessarily decided by a jury's acquittal in a prior trial, the interest in preserving the

(5:11CR00584)

finality of a jury's judgment bars a retrial of that issue.  *See id.* at 118-119.  This form of preclusion is known as *collateral estoppel*, meaning "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970).

In determining whether the doctrine of *collateral estoppel* applies, courts should "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."  *Ashe*, 397 U.S. at 444. Crucially, it is now settled that courts may *not* consider the fact that a jury hung on a particular count as indicative of any aspect of the jury's determination in the *collateral estoppel* analysis.  *Yeager*, 557 U.S. at 117, 122.  As explained by the Supreme Court, "[b]ecause a jury speaks only through it verdict, its failure to reach a verdict cannot–by negative implication–yield a piece of information that helps put together the trial puzzle."  *Id.* at 121.

A criminal defendant carries the burden "to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding."  *Dowling v. United States*, 493 U.S. 342, 350, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990).  Furthermore, that a jury found a fact in the defendant's favor must be shown with "definite assurance" and "clear evidence."  *United States v. Benton*, 852 F.2d 1456, 1466 (6th Cir.), *cert. denied*, 488 U.S. 993, 109 S. Ct. 555, 102 L. Ed. 2d 582 (1988).  The Sixth Circuit has recognized "that when a jury acquits on some counts in a multicount indictment, principles of collateral estoppel may preclude retrial of charges upon which the jury was unable to agree at the earlier trial."  *United States v. Frazier*, 880 F.2d 878, 883 (6th Cir. 1989), *cert.*

(5:11CR00584)

*denied*, 493 U.S. 1083, 110 S. Ct. 1142, 107 L. Ed. 2d 1046 (1990).

### III.  Discussion

The fact that the jury hung on the conspiracy count of the original Indictment "has no place in the issue preclusion analysis." *Yeager*, 557 U.S. at 122.  The Court must, therefore, cabin its analysis to the jury's verdicts of acquittal as to the twenty-two (22) substantive wire fraud counts.

### A.  Trial Record

The Court provided the jury with the following instruction with respect to the four elements of the substantive wire fraud offense[3]:

> For you to find the defendant guilty of wire fraud, you must find the government has proved each and every one of the following elements beyond a reasonable doubt:
>
> First, that the defendant knowingly participated in or devised or intended to devise a scheme to defraud in order to obtain money or property, that is, to fraudulently obtain factoring payments from Aquent Financial Services by creating and submitting false, fictitious and fraudulent invoices to Aquent under the names of various clients purportedly for work performed by Allied Solutions Group for its customers;
>
> Second, that the scheme included a material misrepresentation or concealment of a material fact;
>
> Third, that the defendant had the intent to defraud; and
>
> Fourth, that the defendant used wire, radio or television communications or caused another to use wire, radio or television communications in interstate commerce in furtherance of the scheme.

ECF No. 210 at 222-23.

Had the jury convicted Defendant on the basis of the foregoing elements, it would have had to find that Defendant either used a wire or caused another to use a wire in furtherance of the

---

[3] *See* Sixth Circuit Pattern Jury Instructions § 10.02 (2011).

7

(5:11CR00584)

scheme.  It is evident from the trial record, however, that this was not the thrust of the Government's case.  One of the Government's witnesses, FBI Special Agent Jeffrey Kassouf, testified that Defendant did not personally send the fraudulent invoices described in Counts 2 through 12, and he did not solicit the individual payments described in Counts 13 through 23 by way of those invoices.  ECF No. 209 at 174-75.  Similarly, Robinson, presumably the Government's chief witness, testified that Defendant did not create or send the false invoices.  ECF No. 207 at 158.  There was no evidence presented at trial that Defendant caused either co-defendant, Robinson or Saraswathy, to send a false invoice.  The Government did present, however, abundant evidence that the false invoices were sent by Robinson.  *See* ECF No. 228 at 15-16.  Robinson himself testified that he "typically" sent the false invoices.  ECF No. 207 at 175.

The theory that the Government presented to the jury was that Defendant was an active and knowing participant in the scheme to defraud Aquent.  In its opening statement, the Government argued that Defendant was a "controlling person" in Allied and that he, Saraswathy, and Robinson agreed to sell "ficticious invoices" in order to generate cash more quickly.  ECF No. 201 at 12.  The Government also contended that Defendant "had a significant role to play" in the scheme.  In demonstrating the role that Defendant allegedly played, the Government presented evidence that included each of the transmissions described in Counts 2 through 7 of the Superseding Indictment.

The Government offered Exhibit 183 (the basis for Count 2 of the Superseding Indictment) as proof that Defendant was involved in the scheme to defraud.  Exhibit 183 is an email from Defendant to Aquent employees, Nancy Green and Mark Keehnle, informing them that Allied will bring down its balance in the near future and that Allied would make certain financial documents

8

(5:11CR00584)

available to Aquent.  ECF No. 201 at 263.  Keehnle testified that the email reflected Defendant's realization that Allied would not receive any more funding from Aquent unless Allied decreased its balance.  ECF No. 203 at 162-63.  Keehnle also testified that the email was sent as an effort by Defendant to secure an additional $2.5 million in financing, and that Defendant's role in regard to Aquent was to "give assurances, then pressure [Aquent] for more money."  ECF No. 203 at 163-64.

The Government also introduced Exhibit 190 (the basis for Count 3 of the Superseding Indictment), an email from Defendant to Saraswathy and Robinson with Allied financial statements attached.  Robinson testified that he received that email from Defendant because Allied needed to provide financial information to Aquent.  ECF No. 207 at 87.  Robinson also noted the similarities between the financial statements in Exhibit 190 and the financial statements in Government Exhibits 99 and 100 (the basis for Count 4 of the Superseding Indictment), which were faxed from Allied to Aquent.  ECF No. 207 at 90-96.  Green testified that Exhibits 99 and 100 "were the long-awaited historical financials" that Aquent had been expecting for "months and months, maybe even years" but that Aquent was "dumbfounded" that what they received were merely draft financial statements.  ECF No. 201 at 279-287.  Keehnle testified that he believed from the fax number displayed on the documents that Exhibits 99 and 100 were faxed by Defendant.  ECF No. 203 at 171, 173-74.  The Government also presented evidence that the financial information contained in Exhibits 99 and 100 were false and inflated.  ECF No. 207 at 97; *see* ECF No. 211 at 66, 91.

In addition, the Government submitted Exhibit 193 (the basis for Count 5 of the Superseding Indictment), an email from Defendant to Keehnle.  Keehnle testified that, in the email, Defendant made excuses as to why Aquent had not received certain payments.  ECF No. 203 at 179.

9

(5:11CR00584)

Government Exhibit 197 (the basis for Count 6 of the Superseding Indictment) is an email sent by Defendant to Green and Keehnle.  Attached to the email is a purported letter from Barclays Bank apologizing for problems in processing a payment from an Allied client.  ECF No. 203 at 5-7. Nunzio Domilici, Aquent's Chief Financial Officer, testified that the letter looked suspicious and contained "ridiculous" grammatical errors.  ECF No. 203 at 293.  Finally, the Government offered Exhibit 199 (the basis for Count 7 of the Superseding Indictment). Keehnle testified that in response to his inquiry about a collection from an Allied client, Defendant stated, in an email, Exhibit 199, that he had not seen the payment come in and would keep Keehnle apprised.  ECF No. 203 at 184.

In summary, during the trial, the foregoing exhibits were presented by the Government to prove Defendant's involvement in the scheme to defraud Aquent.  In its closing argument, the Government did not identify for the jury a specific instance in which Defendant used or caused another to use a wire in furtherance of the scheme.  Rather, the Government dedicated its closing argument to illustrating the contours of the conspiracy.  *See* ECF No. 211 at 27-68, 100-105.  The Government emphasized: "This case is about a conspiracy, about a fraud that took place over a long period of time.  Whether the defendant pushed a fax button or not, this conspiracy existed, and this defendant played a significant role in it."  ECF No. 211 at 64-65.  The Government underscored that Defendant could be found guilty of the substantive wire fraud counts not just through application of the traditional wire fraud elements, but also through *Pinkerton*[4] liability and aiding and abetting liability.  ECF No. 211 at 31-34.  Defendant argued that although the evidence established that

---

[4] *See Pinkerton v. United States*, 328 U.S. 640, 646, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

10

(5:11CR00584)

Robinson and Saraswathy had formed and actively facilitated the scheme to defraud Aquent, Defendant did not know about the scheme, was not a member of the scheme, and did not encourage or help his co-defendants in any manner.  *See* ECF No. 211 at 69-99.

Consistent with the theories presented by the Government, Court provided the following instruction to the jury with respect to *Pinkerton* liability[5]:

> There are two ways that the government can prove the defendant guilty of [wire fraud].  The first is by convincing you that he personally committed or participated in those crimes.  The second is based on the legal rule that all members of a conspiracy are responsible for acts committed by other members, as long as those acts are committed to help advance the conspiracy, and are within the reasonably foreseeable scope of the agreement.
>
> In other words, under certain circumstances, the act of one coconspirator may be treated as the act of all.  This means that all the coconspirators may be convicted of a crime committed by only one of them, even though they did not all personally participate in that crime themselves.
>
> But for you to find defendant guilty of wire fraud based on this legal rule, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:
>
> First, that the defendant was a member of the conspiracy charged in Count 1 of the indictment.
>
> Second, that he joined the conspiracy, and while he was still a member of it, one or more of the other members committed the crime of wire fraud.
>
> Third, that this crime was committed to help advance the conspiracy.
>
> And fourth, that this crime was within the reasonably foreseeable scope of the unlawful project.  The crime must have been one that the defendant could have reasonably anticipated as a necessary or natural consequence of the agreement.

ECF No. 210 at 220-21.

---

[5] *See* Sixth Circuit Pattern Jury Instructions § 3.10 (2011).

11

(5:11CR00584)

The Court also provided the following instruction regarding aider and abettor liability[6]:

For you to find the defendant guilty of wire fraud, it is not necessary for you to find that he personally committed the crime. You may also find him guilty if he intentionally helped or encouraged someone else to commit the crime. A person who does this is called an aider and abettor.

But for you to find the defendant guilty of wire fraud as an aider and abettor, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:

First, the crime of wire fraud was committed.

Second, that the defendant helped to commit the crime or encouraged someone else to commit the crime.

And third, that the defendant intended to help commit or encourage the crime.

ECF No. 210 at 235.

## B. Assessment of Acquittals

The trial record discloses that the jury was given clear guidance that certain consequences may attach if the jury found that Defendant was a member of a conspiracy. The Government emphasized to the jury that "[t]his case is about a conspiracy"; ECF No. 211 at 64; and the jury may convict Defendant on the substantive wire fraud counts if *Pinkerton* liability attached. ECF No. 211 at 31. The imposition of *Pinkerton* liability, as instructed by the Court, requires that: (1) Defendant was a member of the conspiracy charged in Count 1 of the Indictment; (2) that while a member [of the conspiracy], another member committed wire fraud; (3) this crime was committed to help advance the conspiracy; and (4) the crime was within the reasonably foreseeable scope of the project.

The evidence presented at trial overwhelmingly and undisputably demonstrated that there *was*

---

[6] *See* Sixth Circuit Pattern Jury Instructions § 4.01 (2011).

12

(5:11CR00584)

a conspiracy to defraud Aquent through the submission of false invoices–and that Robinson and Saraswathy were members of this conspiracy.  Robinson testified that Saraswathy had thought up the invoicing scheme and brought it to his attention.  ECF No. 209 at 91.  Robinson explained that the scheme to defraud began with his and Saraswathy's plan to create advance invoices for services not yet performed in order to pay off Allied's operating expenses.  ECF No. 206 at 112-113.  Then, according to Robinson, the scheme evolved into the creation of "flat-out [invoices] that were never going to be valid . . . ."  ECF No. 206 at 114.  Robinson admitted to creating and sending the false invoices to Aquent; ECF Nos. 206 at 111-112, 193; 209 at 91-92; and testified that Saraswathy supplied him with the fake account information.  ECF No. 206 at 193.  Robinson also conceded that he and Saraswathy discussed how much money the fake invoices should show.  ECF No. 207 at 185-86.  In contrast to the discussions with Saraswathy, Robinson stated that the day-to-day aspect of Allied's wire transfers were not discussed with Defendant; ECF No. 207 at 240; that he could not recall any specific times in which he spoke to Defendant about the scheme; ECF No. 207 at 252; and that he "just thought [Defendant] always knew" about the fake invoices.  ECF No. 206 at 124.

Although Saraswathy did not testify at trial, the Government produced additional evidence regarding his role in the conspiracy.  As one example, Green testified that Saraswathy initiated, arranged, and paid for her to take a trip to England in order to meet with representatives from a purported Allied customer, Hamilton Valves, after certain checks from Hamilton Valves to Aquent had bounced.  ECF No. 203 at 7-9, 104.  According to Green, Saraswathy accompanied her to the offices of Hamilton Valves where Green observed the work spaces, saw posters of Hamilton Valves' products, and met with Hamilton Valves employees, who apologized for the bounced checks and

(5:11CR00584)

agreed to directly wire payments to Aquent. ECF No. 203 at 12-14, 295. It was established during the trial that Hamilton Valves was, in reality, a phony client created by Allied and that the office toured by Green was a sham. ECF Nos. 203 at 241; 204 at 13-14, 41, 54. Robinson testified that he manufactured false invoices using Hamilton Valves as a customer of Allied. ECF No. 206 at 163.

When the evidence presented at trial is matched with the requirements of *Pinkerton*, the following is evident. With respect to the second *Pinkerton* element, the trial record establishes that the jury heard compelling and undisputed evidence that there was a conspiracy between Robinson and Saraswathy to defraud Aquent, and that Robinson committed the crime of wire fraud. The third *Pinkerton* element–that Robinson's crime was committed to advance the conspiracy–was clearly satisfied because the very design of the scheme was to obtain money from Aquent through the submission of false invoices. For that same reason, there can be no doubt that the final element–that the crime was within the reasonably foreseeable scope of the project–was met. Accordingly, the jury could not have rationally grounded its verdicts of acquittal on the second, third, or fourth elements.

To have acquitted Defendant, therefore, the jury *must* have concluded that he did not join in the conspiracy to defraud Aquent. Had the jury concluded differently, the trial result would not have been the same. *Collateral estoppel* is "predicated on the assumption that the jury acted rationally"; *United States v. Powell*, 469 U.S. 57, 68, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984); and a jury is presumed to follow its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000). The jury's verdicts of acquittal, therefore, compel the conclusion, shown here with "definite assurance" and "clear evidence," that the jury found that Defendant did not join in Robinson and Saraswathy's conspiracy to defraud Aquent.

14

(5:11CR00584)

Similarly, the verdicts of acquittal on the Wire Fraud counts establish that the jury found that Defendant did not aid the wire fraud, or, that if he did, he did not do so intentionally.  The elements of aiding and abetting, as given in the Court's instruction, are that: (1) the crime of wire fraud was committed; (2) Defendant helped commit the crime or encouraged someone else to do so; and (3) Defendant intended to help or encourage the crime.  The jury could not have rationally grounded its verdicts upon a finding that the crime of wire fraud did not occur.  The Governments evidence was overwhelming on that point.  Therefore, the jury could only have made a negative finding on the second or third element, or both. Otherwise, Defendant would not have been acquitted on the substantive wire fraud counts.

### C. Application of *Collateral Estoppel*

Based on the foregoing, the Court concludes that *collateral estoppel* bars the Government from reprosecuting Defendant on Count 1 of the Superseding Indictment.  Because the jury found that Defendant did not join in Robinson and Saraswathy's conspiracy to defraud Aquent through the fake invoicing scheme, the Double Jeopardy Clause prohibits the Government from retrying this fact once more.

The Court further determines that the Government may not prosecute Defendant on Counts 2 through 7 of the Superseding Indictment.  The jury's conclusion that Defendant did not join the conspiracy necessarily means that he did not participate in the scheme to defraud Aquent, at least, not with an intent to do so.[7]  To rule otherwise  would require turning a blind eye towards the clear

---

[7] Defendant did not explicitly discuss the element of intent in arguing that the jury found he did not participate in the scheme to defraud.  Nonetheless, the Court construes his arguments as having impliedly asserted that the jury also found he did not intend to defraud Aquent.

(5:11CR00584)

logical import of the jury's conclusion.  The jury's verdicts were reached after considering all of the evidence underlying the new substantive wire fraud counts during the trial.  Because the question of Defendant's intentional participation in the scheme to defraud Aquent is one that the Government must litigate again in order to secure a conviction on each of the new wire fraud counts, the Double Jeopardy Clause protects Defendant from a trial on those counts.

### D.  Government's Counter-arguments

The Government's arguments do not counsel against dismissal.  *See* ECF No. 228.

First, the Government claims that reprosecuting Defendant on the conspiracy count is appropriate because the Court declared a mistrial on that count.  The Government cites *Richardson v. United States*, 468 U.S. 317, 325, 104 S. Ct. 3081, 82 L. Ed. 2d 242 (1984), in which the Supreme Court held that "the failure of the jury to reach a verdict is not an event which terminates jeopardy . . . ."  *Richardson* is distinguishable.  The defendant in *Richardson* did not argue that issue preclusion barred a retrial because an essential fact had been decided in the earlier trial; rather, he argued that the hung counts, standing alone, barred reprosecution.  Therefore, *Richardson* does not govern the Court's analysis.

Second, the Government contends that it may prosecute Defendant on the new wire fraud counts because "each use of the wires constitutes a separate crime under 18 U.S.C. § 1343, even if the several uses are in pursuance of but one single criminal enterprise."  *United States v. Busacca*, 936 F.2d 232, 239 (6th Cir. 1991).  Even if each of the new substantive wire fraud offenses alleges a new use of the wire, the Court has concluded that an essential element necessary to each of the offenses–whether Defendant intentionally participated in the scheme to defraud Aquent--has already

16

(5:11CR00584)

been determined in Defendant's favor.  Trial on the newly charged substantive counts of wire fraud would adversely implicate the constitutional protections afforded under the Double Jeopardy Clause.

Finally, and most pertinently, the Government argues that Defendant fails to meet his burden of showing that the jury found that he was not involved in the scheme to defraud.  In particular, the Government contends that it is unclear which of the substantive wire fraud elements the jury found in Defendant's favor.  This argument ignores the ramifications of the Court's instruction in regard to *Pinkerton* liability.  The Government relegates its discussion of that instruction to a two-sentence footnote, in which the Government claims that *Yeager* forbids the Court from reviewing what the jury decided with respect to Defendant's role in the conspiracy, because that would run afoul of *Yeager*'s admonishment that "the consideration of hung counts has no place in the issue-preclusion analysis."  *Yeager*, 557 U.S. at 123.  The Government misreads *Yeager*.

The defendant in *Yeager* was acquitted by a jury on several counts alleging fraud, but the jury hung on a number of counts alleging insider trading.  *Yeager*, 557 U.S. at 115.  The Government reprosecuted the defendant on some of the insider trading counts on which the jury had hung.  *Id.* The defendant then moved to dismiss all the counts in the new indictment on issue preclusion grounds: he argued that the jury's acquittals on the fraud counts had necessarily decided that he did not possess insider information, a fact essential to all the charges in the new indictment.  *Id.*  After the district court denied the motion, the Fifth Circuit concluded that the jury must have found, when it acquitted the defendant, that he did not have any insider information that contradicted what was presented to the public.  *Id.* at 116.  Although the Fifth Circuit acknowledged that this would normally preclude the Government from retrying the defendant, the court was persuaded that a

17

(5:11CR00584)

rational jury, having concluded that the defendant did not have insider information, would also have acquitted him on the insider trading counts. *Id.* Because the jury hung on those counts, the Fifth Circuit found it "impossible 'to decide with any certainty what the jury necessarily determined'"and affirmed the denial of the defendant's motion to dismiss. *Id.* The Supreme Court reversed.

In a majority opinion written by Justice Stevens, the Supreme Court, citing to *Ashe*, 397 U.S. at 436, reaffirmed the principle that *collateral estoppel* is recognized within the Double Jeopardy jurisprudence. *Yeager*, 557 U.S. at 118-120. The Supreme Court then held that the Fifth Circuit wrongfully held that "*[t]he fact that the jury hung* was a logical wrinkle that made it impossible for the court 'to decide with certainty what the jury necessarily determined.'" *Id.* at 121 (emphasis added). The *Yeager* Court explained in no uncertain terms:

> A hung count is not a 'relevant' part of the 'record of [the] prior proceeding.' . . . Because a jury speaks only through its verdict, its failure to reach a verdict cannot–by negative implication–yield a piece of the information that helps put together the trial puzzle. A mistried count is therefore nothing like the other forms of record material that *Ashe* suggested should be part of the preclusion inquiry. . . . Unlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung count represents. Even in the usual sense of 'relevance,' a hung count hardly 'make[s] the existence of any fact . . . more probable or less probable.' . . . A host of reasons–sharp disagreement, confusion about the issues, exhaustion after a long trial, to name a few–could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. *Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the juror did return.*

*Id.* at 121-22 (citations omitted; emphasis added).

In the present case, the Court has focused its inquiry upon the jury's unanimous verdicts–the only legitimate means by which the jury may speak. The Court has ascribed no meaning to the fact

18

(5:11CR00584)

that the jury hung on the conspiracy count, as "hung counts have never been accorded respect as a matter of law or history, and are not similar to jury verdicts in any relevant sense." *Id.* at 124. By way of its inquiry into the realm of jury decision-making *in which the Court is permitted*, namely, the unanimous acquittals, the Court has concluded that the jury unequivocally found that Defendant did not join a conspiracy to defraud Aquent. Contrary to what the Government asserts, this is permitted. What *Yeager* prohibits in the issue preclusion analysis is consideration of the fact that the jury hung; it does not preclude consideration of an essential fact associated with the hung count.

The Court acknowledges that in this case, as in *Yeager*, there is a suggestion that the jury acted irrationally. In the final analysis, however, it is only proper for the Court to evaluate and give weight to what the jury actually said, as opposed to what the jury failed to say. The Court is mindful that even if the hung count were relevant, "the fact that [Defendant] has already survived one trial should be a factor cutting in favor of, rather than against, applying the double jeopardy bar." *Yeager, 557 U.S. at 122*. The Constitution therefore forbids a trial on the Superseding Indictment.

## IV. Conclusion

Accordingly, the Court grants Defendant's motion to dismiss, in its entirety, the Superseding Indictment docketed at ECF No. 194.

IT IS SO ORDERED.

 September 23, 2013                          /s/ Benita Y. Pearson
Date                                        Benita Y. Pearson
                                            United States District Judge

19